**Opinion issued March 19, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00860-CV

_____

## IN THE INTEREST OF K.S.O.B. AKA K.B., N.A.K.B. AKA N.B., M.C.P.B. AKA M.B., AND N.N.I.B. AKA N.B., CHILDREN

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-02667J**

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

children, K.B.,[2] N.B.,[3] M.B.,[4] and N.N.I.B.,[5] (collectively, "the children").[6]  In five issues, mother contends that the trial court could not terminate her parental rights on the ground that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children[7] and the evidence is legally and/or factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being;[8] she engaged, or knowingly placed the children with persons

---

[2]    We use the initials "K.B." when referring to the child named K.S.O.B., also known as K.B.  When the trial court terminated mother's parental rights, K.B. was thirteen years old.

[3]    We use the initials "N.B." when referring to the child named N.A.K.B., also known as N.B.  When the trial court terminated mother's parental rights, N.B. was eleven years old.

[4]    We use the initial "M.B." when referring to the child named M.C.P.B., also known as M.B.  When the trial court terminated mother's parental rights, M.B. was nine years old.

[5]    We use the initials "N.N.I.B." when referring to the child named N.N.I.B., also known as N.B.  When the trial court terminated mother's parental rights, N.N.I.B. was six years old.

[6]    The trial court also terminated the parental rights of the children's father ("father"). He is not a party to this appeal.

[7]    *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *see also id.* § 161.001(d) ("A court may not order termination . . . based on the failure by [a] parent to comply with a specific provision of a court order if [she] proves by a preponderance of evidence that:  (1) [she] was unable to comply with specific provisions of the court order; and (2) [she] made a good faith effort to comply with the order and the failure to comply with the order is not attributable to [her] fault . . . .").

[8]    *See id.* § 161.001(b)(1)(D).

2

who engaged, in conduct that endangered their physical and emotional well-being;[9] she was the major cause of the failure of the children to be enrolled in school as required by the Texas Education Code;[10] and termination of her parental rights was in the best interest of the children.[11]

We affirm.

## Background

On April 16, 2018, the Department of Protective Services ("DFPS") filed its first amended petition, seeking termination of mother's parental rights to the children and managing conservatorship of the children.[12]

### *DFPS Investigator Prejean*

At trial, the court admitted into evidence, the affidavit of DFPS investigator Danielle Prejean. Prejean testified that the children entered the care of DFPS after it received "a referral alleging [s]exual [a]buse" related to N.N.I.B. Following receipt of the referral, on May 10, 2017, Prejean went to mother's home, where mother lived with father and the children. At that time, the home appeared unsanitary, contained "a horrible odor," and had bags of clothing everywhere.

---

[9]   *See id.* § 161.001(b)(1)(E).

[10]  *See id.* § 161.001(b)(1)(J); *see also* TEX. EDUC. CODE ANN. § 25.085(b) (providing "a child who is at least six years of age . . . shall attend school").

[11]  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

[12]  DFPS filed its original petition on May 11, 2017.

3

Prejean also saw "mice running around the house." The home did not have running water or air conditioning, and the only food in the home was a single bag of ramen noodles. In the living room, Prejean saw a bucket of dirty water on the floor that "the family used to wipe themselves off." Mother told Prejean that the children did not need to be living in such conditions.

While at mother's home, Prejean interviewed mother. Mother stated that she had not allowed the children to attend regular schooling in over two years because the school "show[ed] [them] pictures in books[] and they [were] not supposed to look at pictures" and "the teachers celebrate[d] holidays." Instead, mother claimed that she homeschooled the children, but she did not have any school books or other school-related materials to show Prejean because they had been left at a relative's house. Mother also disclosed that the children had not been to the doctor in approximately five years and did not receive checkups; the family was "about to lose their home"; she and father had engaged in domestic violence in the home; and the family did not receive governmental assistance because mother did not "believe in it." Moreover, mother noted that she had been diagnosed with post-partum depression, but she did not take any medication for her mental-health issues.

Mother further told Prejean that in September 2016, she left the family and "moved in with her cousin[,] Eric[,] . . . who used to rape her as a child." Mother stated that Eric and his brothers, Rodney and Matthew, "all use[d] to rape her." They

4

also had raped mother's eldest daughter, D.S., who is not involved in the instant case.

While mother was away, father left the children with their maternal grandmother because he could not pay for child care. The children stayed with their maternal grandmother and mother's sister from September 2016 until January 2017. When mother and father reunited in January 2017, they picked up the children, who disclosed that, while mother was away, her sister and her sister's husband had hit them and left "marks." N.N.I.B. also told mother and father that, while she was in the care of her maternal grandmother, she had been sexually abused by mother's eldest daughter, D.S., mother's cousin, Rodney, and another woman.

Following N.N.I.B.'s outcry of sexual abuse, mother took her to Bayshore Medical Center for medical treatment; however, because that hospital was not equipped to diagnose or treat N.N.I.B., the hospital staff instructed mother to take N.N.I.B. to either Texas Children's Hospital or the University of Texas Medical Branch ("UTMB"). Mother did not follow through on the referral because father had to go to work and they did not have a car.

Mother further told Prejean that she believed that her family members were "fram[ing]" her, they were trying to destroy her family, and "they probably ha[d] cameras in her television." Mother stated that her family members were powerful, were "out to get her," were "controlling everything," and had been "cursing her with

the [B]ible." Mother yelled at K.B. because she believed that he was "communicating" with her family.

While at mother's home, Prejean also spoke with father about the sexual abuse of N.N.I.B., and he stated that he had "allowed the children to go to their maternal grandmother's home when [mother] left him[] because he needed someone to watch [the children] while he went to work." At the time that he left the children with their maternal grandmother, he knew that mother had been "raped by her cousin, Rodney[,] . . . as a child" and he knew that the children's maternal grandmother did not believe mother about the sexual abuse.

Father also disclosed to Prejean that his employer sometimes gave him money for food or electricity, but "he always ha[d] to pay his [employer] back." And father conceded that "the condition of the [mother's] home need[ed] to be fixed." Like mother, father also did not "believe in governmental assistance" and confirmed that the family would not accept "food stamps." Moreover, father stated that the children did not need to go to the doctor or attend regular school and mother suffered from depression.

While at mother's home, Prejean saw the children and observed that K.B. had "a strong odor to him" and holes in his clothing, N.B. was "dressed appropriately," but "had an odor," and M.B. had on "a dirty shirt" and "had an odor." When Prejean spoke with N.B., he stated that he could not "remember the last time [that] he [had

6

gone] to school." N.B. also disclosed that mother's home did not have running water or food, and in the past, he had gone "a couple [of] days" without eating. Further, N.B. had seen father push mother.

*DFPS Caseworker Carlson*

DFPS caseworker Randie Carlson testified that the children entered the care of DFPS after N.N.I.B. "made an outcry of sexual abuse" and DFPS investigator Prejean found mother's home, where the children were living, to be "in deplorable conditions."

In regard to the sexual abuse of N.N.I.B., Carlson explained that mother left the family for three or four months, and while mother was away, father placed N.N.I.B. in the care of her maternal grandmother. While in the care of her maternal grandmother, N.N.I.B. was sexually abused. Carlson noted that father placed N.N.I.B. in her maternal grandmother's care despite knowing that mother had been sexually abused by her relatives in the past and her mother—the children's maternal grandmother—did not believe mother or do anything to stop the sexual abuse.

According to Carlson, after N.N.I.B. made her outcry of sexual abuse, mother cared for the child emotionally, but waited at least a week before seeking medical treatment for the child. When she did finally take N.N.I.B. to Bayshore Medical Center, mother learned that the hospital could not perform the appropriate testing or procedures, and the hospital staff referred N.N.I.B. to UTMB. Because mother did

7

not follow through and take N.N.I.B to the referred-to hospital, DFPS became involved with the family.

After the children entered DFPS's care, mother received a Family Service Plan ("FSP"), a copy of which the trial court admitted into evidence. Mother's FSP required her to complete a psychosocial evaluation, parenting classes, domestic-violence classes, individual therapy, family therapy, and the "Getting Started Program." Mother was also required to submit to random narcotics testing, maintain stable housing, acquire and maintain a working telephone, and attend visits with the children or contact DFPS if she was unable to attend a visit. Mother completed her psychosocial evaluation and submitted to random narcotics testing in January and April 2018, during which she tested negative for narcotics use. But, mother failed to submit to her required narcotics testing on October 6, 2017 and January 19, 2018, and she did not complete the Getting Started Program, her parenting classes, and her domestic-violence classes. Mother also did not make progress in individual therapy and stopped attending her individual-therapy sessions prior to trial. Mother continued to live in the same home that she had lived in prior to the children's removal, and she refused to accept any "government[al] assistance for housing" that DFPS offered her. Carlson expressed concern regarding mother's inability to complete her FSP because the purpose of mother participating in the required services or classes was for her to "learn [that] certain . . . behaviors [were]

8

not appropriate." And by not completing her FSP, mother failed to demonstrate that she could appropriately parent the children or that she had an understanding of the issues that caused the children to enter DFPS's care in the first place.

In regard to mother's home, Carlson observed that it was not safe. At the time that the children entered DFPS's care in May 2017, the home did not have electricity or running water, wooden boards were holding up the ceilings inside the home, and "[t]here w[ere] holes within the home" and rats. The children disclosed that although they were allowed to use the toilet in the home, they could not flush it. The trial court admitted into evidence two photographs taken of mother's home in May 2017. These photographs show a cluttered living room, containing a couch and a large bucket of water, and a bedroom, containing only a sub-floor, a small bed, trash, and other items.

The trial court also admitted into evidence sixteen photographs taken of mother's home in July 2017, shortly after the children were removed from mother's care. These photographs show a kitchen in disrepair, containing trash and broken cabinetry; a cluttered bedroom with only a sub-floor; a dining area in disrepair, containing clutter and trash and only a sub-floor; a shower with dirt or other dark-substance at the bottom; a cluttered living room with a wooden board holding up the ceiling; multiple other bedrooms full of clutter to the point that they were impassible; a cluttered bathroom with a plastic bag presumably over a window and

containing only a sub-floor; and a dilapidated exterior, with numerous items, including a washing machine, that appear to have been discarded in the yard. In regard to these photographs, Carlson testified that they showed mother's kitchen to be in a poor condition; a big hole in the wall of N.N.I.B.'s bedroom; a cluttered and unsafe "bedroom/hallway" for one of the children; another cluttered bedroom containing unsafe objects for the children; a bathroom without actual "flooring" and a "toilet [that was] not locked down to the ground"; and a wooden board in the living room that appeared to be holding up part of the ceiling. Carlson noted that similar wooden boards could be found in another bedroom and on the home's front porch.

In February 2018, Carlson visited mother's home. At that time, she saw that a "wood[en] [board] was still holding up the [home's] ceiling in the living room" and there were multiple holes in one of the bedrooms though father had patched one hole in another bedroom. In Carlson's opinion, the conditions made the home unsafe.

While Carlson toured mother's home, mother and father prevented her from seeing the home's two bathrooms and their bedroom. And the bedrooms that Carlson did observe were not set up for children and were cluttered to the point that they were unsafe. Although the home had electricity that day, Carlson could not determine whether it had running water or functional bathrooms. The trial court admitted into evidence two photographs taken of mother's home in February 2018.

10

These photographs show the exterior of the home and a dilapidated hallway inside the home that appears impassible due to clutter.

Carlson attempted to visit mother's home again in April 2018, but the first time that she went to the home, mother would not allow her to come inside because she was "a stranger or rapist or predator." When Carlson returned to the home the next day with mother's therapist, Dr. Melody Moore, mother and father allowed Carlson to come inside, but they prohibited her from seeing any room in the home other than the living room. Carlson noted that the home's front porch, at the time, was unsafe because the ceiling of the porch was falling down and only three wooden boards were holding it up. The trial court admitted into evidence six photographs taken of mother's home in April 2018. These photographs show the exterior of the home to be in disrepair; a hole in the front door of the home and holes in the ceiling/roof over the front porch; wooden boards holding up the ceiling/roof above the front porch, which was visibly falling down; termite damage; and rotting wood on the exterior of the home.

Carlson testified that because she was prohibited from entering mother's home after April 2018, she made several subsequent "drive-by" visits to view the home's exterior. During those visits, she saw caution tape around the front porch area, wooden boards holding up the porch in multiple areas, and a hole in the home's front door. According to Carlson, an individual standing on the home's front porch

could see into the attic and into the interior of the home through the hole in the front door. And pests, such as bats, mice, rats, and insects, could enter the home through the hole.

Carlson explained that the condition of mother's home was important because the children needed to be physically safe in their home, and she was concerned about the extensive damage to both the interior and exterior of the home. More specifically, Carlson explained that the home was unsafe because pests were able to enter the home through its holes, the home appeared to be collapsing in multiple rooms, there were "limited necessities" within the home, and it was not set up for the children to be returned. Mother's home was also involved in litigation, as evidenced by a suit for delinquent taxes filed by the La Porte Independent School District and the City of La Porte. What is more, the home was not in the name of either mother or father.

In regard to the children, Carlson testified that DFPS sought to have them adopted into a loving and safe home. Carlson opined that it would be in the best interest of the children to have a safe and stable home where they were cared for, all their needs were provided for, and they were loved. Carlson noted that it was very likely that the children would be adopted because certain relatives and certain foster families had expressed interest in adopting the children. At the time of trial, DFPS was completing home studies with certain relatives.

12

Carlson further testified that when the children entered the care of DFPS, they had not been to the dentist or the doctor in approximately five years, and N.B. had asthma. The children were also "behind" in school because they had not attended regular schooling in approximately three years. Moreover, mother had not been abiding by "certain rules for homeschooling in Texas" and could not produce "visual plans of homeschooling" or any other school-related materials that she had for the children. Mother's home also did not contain a designated area for homeschooling, and the children did not have a schedule for their homeschooling. K.B. and N.B. both disclosed to Carlson that while living with mother, there were days when they were hungry and they did not eat.

While in the care of DFPS, the children were attending regular school and doing very well. The children also had medical and dental checkups. N.B., M.B., and N.N.I.B. were in a foster home, and K.B. was in an emergency shelter because he had chosen to be there. Carlson reported that all of the children could immediately be moved in together with an available foster family.

In regard to the children's desires, K.B. told Carlson that he did not want to return home because he "felt depressed at home," he wanted to attend regular school full-time, and he did not want to be homeschooled. N.B. had "mixed feelings" about returning home. According to Carlson, "[o]ne moment, he [did not] want to go home and he want[ed] to go to [regular] school full-time and play sports," but at other

13

times, he wanted to go home. M.B. and N.N.I.B. also had "mixed feelings" about returning home. N.N.I.B., at one point, told Carlson that "she wanted to be adopted by a whole new family," but at another time she stated that she wanted to return home. When asked whether the children wanted to attend regular school, Carlson responded, "[y]es."

Carlson further testified that although mother had visits with the children while they were in the care of DFPS, she had missed multiple visits with them, including one visit in January 2018, one visit before January 2018, most of her visits in May 2018, all of her visits in June 2018, and her visits in the beginning of July 2018. Mother did not always notify DFPS when she was not going to attend a visit, and the children were disappointed when mother failed to show up. At the last visit between mother and the children, mother arrived forty-five minutes late. Additionally, during the pendency of the instant case, mother failed to answer her telephone for approximately two months, which upset the children because they had wanted to speak to her. Carlson did note that when mother actually attended visits with the children she brought them food and asked the children about the activities they were participating in and "how their lives [were] going." The children were happy to see mother at their visits, and there appeared to be a bond between mother and the children.

Finally, Carlson opined that termination of mother's parental rights was in the best interest of the children because mother had been given more than a year to complete her FSP, participate in her required services and classes, and show progress within herself and her home, but mother had been unable to do so. In addition, the children deserved a safe and stable home where they could flourish and they deserved to be in a regular school so that their educational needs could be fully met.

### *Mother's Therapist Moore*

Mother's therapist, Moore, testified that she conducted individual-therapy sessions with mother, individual-therapy sessions with father, and family-therapy sessions with mother, father, and the children. Mother began seeing Moore for individual therapy in November 2017, and Moore diagnosed her with depression, anxiety, and post-traumatic stress disorder ("PTSD"). Mother, during her individual-therapy sessions, appeared angry, agitated, and argumentative about half of the time. Although mother made some progress through therapy, her progress was slow. Moore opined that mother should continue participating in individual therapy for another year because she had not met any of her treatment goals. Moore, however, could not say with any certainty that mother would actually continue participating in individual therapy.

The trial court admitted into evidence several Progress Reports from mother's individual-therapy sessions. In her reports, Moore generally noted that mother,

during her individual-therapy sessions, appeared angry, agitated, anxious, defensive, and paranoid, mother refused to participate, and she was resistant, difficult to redirect, and suspicious. Moore also stated that mother "misperceive[d] the intentions of others, fe[lt] conspired against, and ha[d] difficulty seeing her part in her situation." Moore expressed concern that mother was defensive, guarded, paranoid, and "difficult to reason with." Although there were times during her individual-therapy sessions when mother was more cooperative, compliant, and calm, at other times, mother "rant[ed] and rav[ed]" and became hostile. In her March 2018 Progress Report, Moore noted that mother had "regressed in terms of her ability to monitor and manage her emotions and behaviors." Mother reported to Moore, during her individual-therapy sessions, that she was paranoid, felt that her family members were "out to harm her," was easily angered and agitated, did not "work with the public well," she and father had not been eating much, and at times, they did not get along.

In regard to DFPS's involvement with her family, Moore explained in her Progress Reports that mother expressed "anger regarding taking [N.N.I.B.] to the hospital" for treatment after the child had made an outcry of sexual abuse because mother felt it had been "used against her." Mother also did not understand why DFPS was involved with the children, felt angry, wronged, and treated unfairly, and was unable to "see things from any other perspective." Mother told Moore that

16

DFPS was involved in "a conspiracy against her." Moore, in her reports, expressed concern that if the children were returned to mother's care, mother would "never take any of them for medical treatment or care again [because] she perceive[d] that [to be] the impetus that caused [DFPS's] involvement" in the instant case. In other words, mother believed that if she had not taken N.N.I.B. to the hospital for treatment after the child made her outcry of sexual abuse, then she would still have custody of the children.

In her December 2017 Progress Report, Moore noted that during a visit with the children, mother criticized one of the children because he was wearing pajamas. When the DFPS caseworker at the visit tried to redirect mother, mother became agitated, argumentative, and "stormed out of the visitation room." After Moore encouraged mother to return to the visit, mother spent time talking to each child and "grooming" them, but Moore expressed concern that mother had become angry, agitated, and argumentative with the DFPS caseworker in front of the children. In her December 2017 Progress Report from father's individual-therapy sessions, Moore, who observed a visit between mother, father, and the children, noted that mother appeared "upset and agitated" at the visit, while father remained calm.

In the most recent Progress Report for mother, from April 2018, Moore explained that DFPS caseworker Carlson came with Moore to visit mother's home, and mother did not want to let Carlson inside. After father eventually agreed to

allow Moore and Carlson into mother's home, mother was combative, verbally aggressive, hostile, argumentative, and defensive. Mother repeatedly stated that she did not trust Carlson or Moore, and she refused to allow Carlson to see the home's bathrooms or the bedroom where the children would be staying if they were returned home. At the time, mother's mood was anxious, aggressive, suspicious, irritable, and hostile, her thought processes were paranoid, and her speech was "pressured and loud."

In regard to the goals that Moore had set for mother to achieve during individual therapy, in her April 2018 Progress Report, Moore noted that mother had not achieved any of them. The report listed mother as progressing on her goal of "discuss[ing] the problems in her relationship [with father] that led to her leaving [the] home, which ultimately led to [DFPS's] involvement" and "discuss[ing] how domestic violence affect[ed] [the] children." Mother, however, was "[n]ot [p]rogressing" on her goal of "discuss[ing] 3 short term and 3 long term personal and professional goals" and "process[ing] her childhood and adult sexual abuse [to] identify how it ha[d] affected her ability to parent and her relationship with [father]."

Moore further testified that she began seeing the family for family-therapy sessions in February 2018. Moore noted that she did not see the children at the time of their removal from mother's care, in May 2017, and she did not know whether or not they were healthy at that time. At the February family-therapy session with

18

Moore, the children appeared to be healthy with no injuries; however, their behavior was anxious, depressed, and frustrated. At times during the family-therapy sessions and mother's visits with the children, mother would become "upset with the children or upset with something that was going on" and that caused angst or tension. During at least one visit with the children, Moore had to remove mother from the visit, talk to her, and redirect her. Moore opined that the family should continue participating in family therapy for another year.

During Moore's testimony, the trial court admitted into evidence two Progress Reports from the family's therapy sessions. In her April 2018 report, Moore noted that the family was progressing on the goal of displaying open communication, but the family was not progressing on the goal of expressing feelings appropriately. And mother and father were not progressing on their goal of responding to the emotional needs of the children appropriately. Moore further noted that during the family-therapy session, the family appeared relaxed and laughed and enjoyed doing an activity. Mother help N.N.I.B. with the activity, while father worked with N.B. and M.B. K.B., however, worked alone and appeared distant, detached, and sad. After the session was over, K.B. "relax[ed] a little but still appeared depressed."

In her May 2018 report, Moore again noted that the family had still not achieved any of the above listed goals and mother and father were still not progressing on their goal of responding to the emotional needs of the children

appropriately. However, mother and father, during the planned activity, did encourage the children to think independently and were not overly combative or angry. K.B. still appeared distant and detached, but the other children appeared engaged and seemed happy to spend time with mother.

In regard to mother's home, where Moore conducted her therapy sessions, Moore testified that the living room of the home—the only portion of the home that she had ever entered—was fine, nice, clean, and "picked up." However, Moore noted that when the weather was hot outside, the inside of the home was hot, and during the wintertime, the home was freezing cold. Further, Moore, in her Progress Reports, expressed concern that mother's home did not have heat. Moore opined that the children would probably want to return to the home where they grew up; however, she did not believe that the children should be allowed in the home when it was freezing cold.

In regard to mother's ability to parent, Moore opined that mother could parent the children with support, including "wraparound services, case management, [and] therapy," but Moore did not believe that mother could parent the children independently. Moore did note that it appeared that mother loved the children and missed them; however, mother needed "a lot of help to overcome a lot of obstacles." And although mother might have good intentions related to the children, her thinking was rigid and difficult to overcome. Mother also told Moore that she would not take

20

medication for mental-health issues or see a psychiatrist. Moore noted that there had been domestic violence between mother and father in the past, although through therapy mother and father had begun to communicate better, resolve conflicts better, discuss the triggers that had led to their disagreements, and "come up with some different strategies when they are feeling upset with each other."

Moreover, Moore explained that if the children were returned to mother's care, mother would continue homeschooling them. This concerned Moore because mother could not provide schooling for the children "beyond [that] . . . of [an] 8th grade education." When asked whether she believed that mother understood that the children "need[ed] to be in school every day," Moore responded that she was "not sure." Moore also opined that the children should only be returned to mother's care with a condition that they attend regular schooling. And although the children had found school to be challenging and they were not used to its structure, the children were "gain[ing] a lot from being in school."

Finally, Moore opined that the children needed permanency and they should not be returned to mother's home unless it was safe and the home had electricity and running water. At the time of trial, Moore testified that returning the children to mother's care would be detrimental to their emotional well-being and not in their best interest.

*Mother*

Mother testified that the children were removed from her care in May 2017 after N.N.I.B. made an outcry of sexual abuse. N.N.I.B. told mother and father that mother's relatives, including mother's cousin, Rodney, and mother's eldest daughter, D.S., had sexually abused her during December 2016 or January 2017 when mother had left the family. N.N.I.B. told mother and father that a third person, a woman, had also sexually abused her during that time period. After N.N.I.B. disclosed the sexual abuse, mother "started to look for a ride [to a hospital] and tr[ied] to console [father] because [he] was very angry." Approximately eleven days later, mother took N.N.I.B. to Bayshore Medical Center, but the hospital could not "test [to] see if [N.N.I.B.] had been sexually [abused]." Accordingly, the hospital referred N.N.I.B. to another hospital, but mother never followed through on the referral.

Mother further testified that when the children lived with her, she took care of them and father worked. Although the family had faced "hardships," father ensured that the family had food. According to mother, when DFPS investigator Prejean came to her home on May 10, 2017, although there was very little food in the home and no food in the refrigerator or the pantry, there was "a big plastic bag of [r]amen noodles" and two cans of chili in the home. According to mother, "there w[ere] times where [the family] . . . ha[d] [a] substantial amount of groceries," but there

were also times where they had "little or none." Mother stated that she did not seek government assistance, such as "food stamps," when the children were in her care because it was "against [her] belief[s]." When asked whether she would be "surprise[d] . . . if [the] children [had] said that there were some days that they went without eating," mother responded that "it wouldn't surprise [her] at all."

Mother also testified that there were periods of time when her home did not have running water and K.B. and N.B. "probably used the bathroom outside" or the children "went to [other] places to . . . use the bathroom." According to mother, the children either bathed in the tub or in a "big pot[]." Mother did note that the children were never injured by the condition of her home, and the children were not malnourished while in her care.

About her absences from her children, mother explained that, at times in the past, she had left father and the children for more than twenty-four hours in order "to breathe" and "[t]o vent." For instance, in September 2016, mother left the family for four months after she had an argument with father. Mother did not speak to father or the children while she was away, and because mother left, father did not have any child care for the children—a fact that mother knew prior to her leaving the family. Consequently, father took the children to stay with their maternal grandmother, and it was during this time that N.N.I.B. was sexually abused. Though mother believed that her own family "pose[d] a danger to [her] children," she

admitted that she did not protect N.N.I.B. from being sexually abused because she "w[as] not around."

After the children entered the care of DFPS, mother received an FSP, and she did her best to complete its requirements. For instance, mother participated in the psychosocial evaluation and narcotics testing, but she did not know whether she had completed her domestic-violence classes. According to mother, she had been diagnosed with depression, anxiety, and PTSD, but she did not seek treatment for her mental-health issues.

During mother's testimony, the trial court admitted into evidence thirteen photographs of the home, which according to mother, depicted the home "at th[e] present time." These photographs show the exterior of the home, a bed, two bathroom sinks and toilets, a portion of a shower, what appears to be patches to a wall, and a ceiling in disrepair. In regard to her home, mother testified that she and father "did the inside of the house to the best of [their] ability," including the bathrooms and "the rooms." Nevertheless, mother noted that there were still wooden boards inside the home that were "propping the roof up." And she explained that she did not continue to allow DFPS caseworker Carlson or the children's attorney ad litem into her home during the pendency of the case because they had already been inside the home once and whenever they would come to the home, they would "see[] something" that would prolong her reunification with the children.

24

With respect to the children's healthcare and education, mother testified that they had not been to the doctor in approximately four or five years, although she knew that K.B. and N.B. had asthma "real bad." And while the children were in her care, mother claimed that she homeschooled them, despite having stopped attending school herself in the eighth grade. Mother, however, could not produce any school-related materials showing that she was providing adequate homeschooling for the children because the children's "workbooks" were at her sister's home. After the children entered DFPS's care, mother learned that they were struggling in school.

Mother further testified that she loved her children and she wanted them to return to her care. While they were in the care of DFPS, mother had visits with the children, which she believed were appropriate.

### Father

Father testified that he was the provider for the family and at times he had difficulty supporting the family. In regard to mother, father explained that on two occasions she had left the family. The last time that mother had done so, she left him to care for the children by himself for several months, which he was unable to do. Father further testified that he and mother had a history of domestic violence and during one incident he "hit her in the side," but he "did not break her ribs." Father noted that he and mother "argue[d] a lot."

With respect to the children, father explained that, prior to them entering DFPS's care, they were homeschooled, although he and mother had not "been approved by the State of Texas to homeschool" the children. In regard to N.N.I.B., father explained that after the child had made her outcry of sexual abuse, he and mother took her to Bayshore Medical Center. However, when they were referred to another hospital they did not follow through on the referral because the person that had given them a ride wanted to go home and mother and father were unsuccessful in obtaining another ride. Father noted that he had previously told mother that if she would have let him just "kill" the individuals that had sexually abused N.N.I.B. then DFPS would not be involved with the family.

In regard to mother's home, father testified that the home is in a sufficient condition for the children to be returned. At the time of trial, the home had running water and did not have mice, and the remaining wooden boards inside the home were not to support the roof, but were for him and mother to hang "ivories on." Further, according to father, he and mother were not at risk to lose the home despite any current litigation, he and mother had not received any eviction notices, and he had paid some taxes related to the home. Father did concede that in the past mother's home contained mice and the home had "a termite problem."

Finally, father testified that it would be in the children's best interest for them to have a safe home, education, medical attention, and "food every day." And when

asked whether he would allow the children to attend school every day if they were returned home, father responded that he "c[ould not] say."

**Standard of Review**

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction

as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN.

§ 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).  Because the

standard of proof is "clear and convincing evidence," the Texas Supreme Court has

held that the traditional legal and factual standards of review are inadequate.  *In re

J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights

case, we must determine whether the evidence, viewed in the light most favorable

to the finding, is such that the fact finder could reasonably have formed a firm belief

or conviction about the truth of the matter on which DFPS bore the burden of proof.

*Id.* at 266.  In viewing the evidence in the light most favorable to the finding, we

"must assume that the factfinder resolved disputed facts in favor of its finding if a

reasonable factfinder could do so," and we "should disregard all evidence that a

reasonable factfinder could have disbelieved or found to have been incredible."  *In

re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted).  However,

this does not mean that we must disregard all evidence that does not support the

finding.  *In re J.F.C.*, 96 S.W.3d at 266.  Because of the heightened standard, we

must also be mindful of any undisputed evidence contrary to the finding and consider

that evidence in our analysis.  *Id.*  If we determine that no reasonable trier of fact

could form a firm belief or conviction that the matter that must be proven is true, we

must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

### Sufficiency of Evidence

In her first, second, third, and fifth issues, mother argues that the trial court erred in terminating her parental rights to the children because the evidence is legally and/or factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being; she engaged, or

29

knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being; she was the major cause of the failure of the children to be enrolled in school as required by the Texas Education Code; and termination of her parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (J), (b)(2); *see also* TEX. EDUC. CODE ANN. § 25.085(b).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangering Environment

In her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights to the children under section 161.001(b)(1)(D) because "[t]here is almost no

evidence . . . regarding the condition of [mother]'s home at the time of [the children's] removal," the majority of the photographs of mother's home that were admitted into evidence do not show the state of the home at the time of the children's removal, mother denied that her home was in a dangerous condition, and the children, while in her care, were healthy and did not suffer injury or malnutrition while in her home.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the[ir] physical or emotional well-being."  *Id.*  To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health.  *Boyd*, 727 S.W.2d at 533; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotations omitted).  The children are endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards.  *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159–60 (Tex. App.—El Paso 2014, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment."  *Boyd*, 727 S.W.2d at

533. However, it is not necessary that the endangering conduct be directed at the children or that the children actually suffer injury. *Id.*

Subsection D focuses on the children's surroundings and environment and requires a showing that the environment in which the children were placed endangered their physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being."); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the children's living conditions as well as a parent's conduct in the home because the parent's conduct in the home can create an environment that endangers the children's physical and emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (internal quotations omitted); *see also In re I.L.L.*, No. 14-09-00693-CV, 2010 WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.) (although subsection D concerns child's living environment rather than conduct of parent, parental conduct certainly relevant to child's environment); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) ("It is illogical to reason that inappropriate, debauching, unlawful, or

unnatural conduct of persons who live in the home of a child . . . are not inherently a part of the 'conditions and surroundings' of th[e] . . . home . . . ."). For instance, inappropriate, abusive, or violent conduct by a parent is a part of the "conditions or surroundings" of the children's home and may produce an environment that endangers their physical or emotional well-being. *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (internal quotations omitted); *In re M.R.J.M.*, 280 S.W.3d at 502; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet).

The relevant time frame for establishing that a parent "knowingly . . . allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being" is prior to the children's removal. *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). And a fact finder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.). Subsection D permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

### 1. Unsanitary Living Conditions

Allowing children to live in unsanitary conditions endangers their physical and emotional well-being. *See D.K., Sr. v. Tex. Dep't of Family & Protective Servs.*, No. 03-13-00816-CV, 2014 WL 1910337, at *4 (Tex. App.—Austin May 9, 2014, no pet.) (mem. op.); *In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013 pet. denied); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions . . . may prove endangerment."). And the children's own uncleanliness constitutes "indicia which may prove endangerment." *In re P.E.W.*, 105 S.W.3d at 777; *see also In re R.D.H.*, No. 12-03-00390-CV, 2005 WL 1000617, at *4–5 (Tex. App.—Tyler April 29, 2005, no pet.) (mem. op.) (considering evidence children were dirty and smelled poorly in holding evidence sufficient to support finding that mother placed or allowed her children to remain in environment that endangered their physical and emotional well-being); *In re H.B.*, No. 07-04-0010-CV, 2004 WL 1313764, at *2–3 (Tex. App.—Amarillo June 14, 2004, no pet.) (mem. op.) ("Continually exposing the children to unsanitary living conditions[] [and] allowing them to remain physically dirty . . . constitutes [sufficient] evidence . . . that [parent] knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered the physical and emotional well-being of [her children]."). Notably, the children "need not develop or succumb to a malady due to the

34

[unsanitary] conditions before it can be said that" they were endangered. *In re P.E.W.*, 105 S.W.3d at 777; *see also Boyd*, 727 S.W.2d at 533 (endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but not necessary that endangering conduct be directed at children or that children actually suffer injury).

Here, the record contains evidence that the children were living in deplorable conditions prior to their removal from mother's care. DFPS investigator Prejean testified that mother's home, in May 2017, was unsanitary and contained "a horrible odor." *See In re A.R.R.*, No. 01-18-00043-CV, 2018 WL 3233334, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.) (unclean home jeopardized children's physical and emotional well-being); *In re P.E.W.*, 105 S.W.3d at 777–78 (home described as "filthy" and containing "an odor" (internal quotations omitted)). Prejean also saw "mice running around the house" and bags of clothing everywhere. *See Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 352, 354–55 (Tex. App.—Austin 2000, no pet.) (holding evidence sufficient to support finding children endangered by environment where home was "filthy," contained rodents, and had clothes and trash everywhere). The home did not have running water or air conditioning. *See In re A.R.R.*, 2018 WL 3233334, at *5 (lack of running water in home jeopardized children's physical and emotional well-being); *In re P.E.W.*, 105 S.W.3d at 777–78 (holding evidence sufficient to support finding

parent placed children or allowed them to remain in environment that endangered them where home lacked running water).

Prejean further noted that there was not any food in the home, other than a single bag of ramen noodles, and there was a bucket of dirty water on the floor that "the family used to wipe themselves off." *See In re A.R.R.*, 2018 WL 3233334, at *5 (sufficient evidence children endangered by environment where parent's home lacked running water and family "carried . . . buckets of water to their home" to use); *In re D.M.*, 452 S.W.3d 462, 469–70 (Tex. App.—San Antonio 2014, no pet.) (evidence sufficient to support finding parent placed or allowed child to remain in endangering conditions and surroundings where home had no food and unsanitary); *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 149 S.W.3d 814, 818–20 (Tex. App.—Eastland 2004, no pet.) (considering evidence that home contained almost no edible food).

Mother admitted to Prejean that the children did not need to be living in such conditions, and father told Prejean that "the condition of [mother's] home need[ed] to be fixed." *See In re E.W.*, No. 10-16-00132-CV, 2017 WL 4079713, at *2–5 (Tex. App.—Waco Sept. 13, 2017, no pet.) (mem. op.) (parents conceded home "not sanitary for the children at th[e] time" of removal); *In re A.T.*, 406 S.W.3d at 371 (parents conceded condition of room where child was living was "not good" (internal quotations omitted)).

Prejean also testified that while at mother's home, she saw the children. At that time, K.B. had "a strong odor to him" and holes in his clothing, N.B. was "dressed appropriately," but he "had an odor," and M.B. had on "a dirty shirt" and "had an odor." *See In re E.W.*, 2017 WL 4079713, at *5 (considering cleanliness of children in holding evidence sufficient to support finding parents placed or allowed children to remain in conditions endangering their emotional or physical well-being); *In re A.T.*, 406 S.W.3d at 371–72 (poor hygiene may constitute condition that endangers child's physical and emotion well-being); *In re C.M.W.*, No. 01-02-00474-CV, 2003 WL 579794, at *3–4 (Tex. App.—Houston [1st Dist.] Feb. 27, 2003, no pet.) (mem. op.) (children were dirty, had poor hygiene, and offensive body odors). When Prejean spoke to N.B., he disclosed that mother's home did not have running water or food and, in the past, he had gone "a couple [of] days" without eating. *See In re D.M.*, 452 S.W.3d at 469–70 (evidence sufficient to support finding parent placed or allowed child to remain in endangering conditions where home had no food and child appeared hungry).

DFPS caseworker Carlson similarly testified that at the time the children entered the care of DFPS, mother's home did not have electricity or running water. And the children disclosed that although they were allowed to use the toilet in the home, they could not flush it. *See In re A.L.*, 545 S.W.3d 138, 146–47 (Tex. App.—El Paso 2017, no pet.) ("[T]he toilets [in home where child was living] were often

not flushed."); *D.K., Sr.*, 2014 WL 1910337, at *4 (considering lack of working toilet in determining evidence sufficient to support finding child's environment endangered his emotional and physical well-being); *In re P.E.W.*, 105 S.W.3d at 777–78 (holding evidence sufficient to support finding parent placed children or allowed them to remain in environment that endangered them where "toilet did not work and remained unflushed"). Further, mother's home, at the time of the children's removal, had wooden boards in the interior of the home that were holding up the ceilings, visible holes in the interior of the home, and rats. *See In re E.W.*, 2017 WL 4079713, at *4–5 (considering evidence that "structure of the home was decaying," "plumbing problems," and "holes in the walls"); *In re P.E.W.*, 105 S.W.3d at 777–78 (noting walls of home were "kind of falling down" and ceiling "was caving in and falling down" (internal quotations omitted)). K.B. and N.B. both disclosed to Carlson that while they were living with mother, there were days when they were hungry and did not eat.

The trial court also admitted into evidence two photographs taken of mother's home in May 2017. These photographs show a cluttered living room with a couch and a large bucket of water as well as a bedroom, with only a sub-floor, a small bed, trash, and other items. *See In re A.L.*, 545 S.W.3d at 146–47 (noting clutter in home when determining evidence sufficient to support finding parent placed or knowingly allowed child to remain in conditions or surroundings that endangered her physical

and emotional well-being); *In re M.F.*, 173 S.W.3d 220, 224–25 (Tex. App.—Dallas 2005, no pet.) (evidence sufficient to support finding mother allowed child to remain in conditions or surroundings which endangered him where home was "cluttered and full of trash").

Mother testified that there were periods of time when her home did not have running water and K.B. and N.B. "probably used the bathroom outside" or the children "went to [other] places to . . . use the bathroom." *See In re A.R.R.*, 2018 WL 3233334, at *5 (considering that "[t]he family was toileting outdoors" in determining evidence sufficient to support finding parent knowingly placed children in conditions that endangered their physical and emotional well-being); *Silver v. Tex. Dep't of Protective & Regulatory Servs.*, No. 05-99-00690-CV, 2000 WL 1835326, at *4–5 (Tex. App.—Dallas Dec. 14, 2000 no pet.) (not designated for publication) ("There was no running water in the home[,]" and "[the children] had to go outside to use the bathroom[.]"). And the children, while living in her home, either bathed in the tub or in a "big pot[]." *See In re A.R.R.*, 2018 WL 3233334, at *5 (sufficient evidence children endangered by environment where parent's home lacked running water and family "carried . . . buckets of water to their home" to use). When mother was asked at trial if she would be "surprise[d] . . . if [the] children [had] said that there were some days that they went without eating," mother responded that "it wouldn't surprise [her] at all."

On appeal, to support her lack-of-sufficient-evidence argument, mother relies on her own testimony that her home was not "in a dangerous condition," her home was safe, and the children "ate" and "never went without food" while in her care. However, we note that that the trial court, as the fact finder, is "the sole judge of the credibility of the witnesses and the weight to give their testimony." *See Jordan*, 325 S.W.3d at 713; *see also In re J.P.B.*, 180 S.W.3d at 573 (appellate court may not weigh witness's credibility because it depends on appearance and demeanor which are within domain of trier of fact). And the trial court may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). It is also free to believe or disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony. *In re C.E.S.*, 400 S.W.3d 187, 195 (Tex. App.—El Paso 2013, no pet.).

Further, although mother asserts that the children, while in her care, were healthy and not malnourished, and "none of the children suffered any injury from living in [her] home" or suffered "medically or psychologically" from the condition of her home, we note that the children need not suffer injuries or harm because of the conditions or surroundings to which they are exposed in order for the evidence to be sufficient to support a finding that mother knowingly placed, or allowed her children to remain, in conditions that endangered their physical and emotional well-being. *See Boyd*, 727 S.W.2d at 533; *In re P.E.W.*, 105 S.W.3d at 777.

## 2. Domestic Violence

A parent's violent or abusive conduct may produce an environment that endangers the physical and emotional well-being of the children. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re S.R.*, 452 S.W.3d at 360 ("[e]nvironment" refers not only to acceptability of living conditions, but also to parent's conduct in her home (internal quotations omitted)). And domestic violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet); *see also In re A.V.W.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi–Edinburg May 9, 2013, pet. denied) (mem. op.) ("It is self[-]evident that parents perpetrating violence towards certain members of the family threaten the emotional developmental and well-being of any child.").

Further, the fact that the children witness violence directed at another member of the household supports a finding of endangerment. *See In re A.V.W.*, 2013 WL 1932887, at *4–5; *see also In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.) ("[A] child can suffer emotional abuse when witnessing domestic violence in the home."); *Pruitt v. Tex. Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *6–7 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.) (parent placed children in dangerous environment when

41

she exposed them to violence and domestic fights). And evidence that a parent does not remove her children from, or allows them to remain in a home where there is violent conduct, supports termination. *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *18 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.); *In re A.V.W.*, 2013 WL 1932887, at *5; *see also In re T.S.*, No. 02-10-00089-CV, 2010 WL 4486332, at *7–8 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (parent continually placed child in environment where violence took place).

Here, DFPS investigator Prejean testified that, in May 2017, prior to the children's removal, mother disclosed to her that she and father had engaged in domestic violence in the home. *See In re S.Z.*, No. 04-18-00095-CV, 2018 WL 3129442, at *2, *4–6 (Tex. App.—San Antonio June 27, 2018, pet. denied) (mem. op.) (evidence sufficient to support finding parent placed or allowed child to remain in conditions or surroundings that endangered her physical and emotional well-being where parent admitted to history of domestic violence); *In re J.D.W.*, No. 11-11-00027-CV, 2011 WL 3653810, at *2 (Tex. App.—Eastland Aug. 18, 2011, no pet.) (mem. op.) (evidence sufficient where parent admitted he had engaged in domestic violence). And when Prejean spoke to N.B., he disclosed that, in the past, he had seen father push mother. *See In re K.S.*, No. 02-14-00073-CV, 2014 WL 3867529, at *9–10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.)

(evidence sufficient to support finding parent placed or allowed children to remain in conditions or surroundings which endangered their physical and emotional well-being where children disclosed that they had witnessed violence in home); *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied) (child's presence during parent's violent conduct directed at other parent is evidence of endangerment). Further, father testified that he and mother had a history of domestic violence and during one incident he "hit her in the side," but he "did not break her ribs." In general, he noted that he and mother "argue[d] a lot."

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being. *See id.* Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or any

43

disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being. *See id.*

We overrule mother's first issue.

As previously noted, only one predicate finding under Texas Family Code section 161.001(b)(1) is necessary to support termination of mother's parental rights to the children. *See In re A.V.*, 113 S.W.3d at 363. Accordingly, having held that the evidence is legally and factually sufficient to support the trial court's finding, under Texas Family Code section 161.001(b)(1)(D), that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being, we need not address mother's second and third issues challenging the trial court's findings, under Texas Family Code sections 161.001(b)(1)(E) and (J), that mother engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being or that she was the major cause of the failure of the

children to be enrolled in school as required by the Texas Education Code. *See id.*; *Walker*, 312 S.W.3d at 618; *see also* TEX. R. APP. P. 47.1.

Further, having held that the evidence is legally and factually sufficient to support the trial court's finding, under Texas Family Code section 161.001(b)(1)(D), we also need not address mother's fourth issue in which she argues that the trial court was prohibited from terminating her parental rights on the ground that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(O), because the defense provided by Texas Family Code section 161.001(d) bars termination of her parental rights. *See id.* § 161.001(d); *see also In re A.V.*, 113 S.W.3d at 363; *Walker*, 312 S.W.3d at 618; *see also* TEX. R. APP. P. 47.1. Moreover, the defense provided for in section 161.001(d) does not apply to any suit filed prior to September 1, 2017, including the instant case. *See* TEX. FAM. CODE ANN. § 161.001(d); *see also* Act of May 26, 2017, 85th Leg., R.S., ch. 317, §§ 12, 73(c), 79, 2017 Tex. Sess. Law Serv. 615, 618, 640–41 (codified at TEX. FAM. CODE ANN. § 161.001(d)); *In re J.S.G.*, No. 04-18-00476-CV, 2019 WL 113736, at *3 n.1 (Tex. App.—San Antonio Jan. 7, 2019, no pet.) (mem. op.); *In re S.J.N.*, No. 14-18-00529-CV, 2018 WL 6494256, at *5 (Tex. App.—Houston [14th Dist.] Dec. 11, 2018, pet. denied) (mem. op.).

**B. Best Interest of Children**

In her fifth issue, mother argues that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of the children because the evidence of the children's desires weighs against termination; there is no evidence that mother failed to meet the children's emotional needs, that the children were injured in mother's home, that mother was a physical danger to the children, or that the children had a medical condition that went untreated; mother can "parent the children with the help of supportive services"; there is no evidence of the parental abilities of anyone else with whom the children might be placed or of the stability of the children's potential placement; it will take "several months before the children [can] be potentially placed with . . . relatives, if they could be placed with . . . them at all" and mother might be in a position to take the children back at that time; mother can continue to make improvements to her home; and it is not mother's fault that she did not complete her FSP.

A strong presumption exists that the children's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). But, it is also presumed that the prompt and permanent placement of the children in a safe environment is in their best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d 379, 383

46

(Tex. App.—Amarillo 2011, no pet.). The best-interest analysis evaluates the best interest of the children, not the parent. *See In re D.S.*, 333 S.W.3d at 384.

In determining whether the termination of mother's parental rights is in the best interest of the children, we may consider several factors, including: (1) the children's desires; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.— Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any

unique set of factors nor limit proof to any specific factors."). The same evidence of acts and omissions used to establish grounds for termination under section 161.001(b)(1) may also be relevant to determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. Children's Desires

At the time mother's parental rights were terminated, K.B. was thirteen years old, N.B. was eleven years old, M.B. was nine years old, and N.N.I.B. was six years old. K.B. did not want to return home because he "felt depressed at home," he wanted to attend regular school full-time, and he did not want to be homeschooled. *See In re J.C.*, No. 07-16-00024-CV, 2016 WL 2609595, at *2–3 (Tex. App.—Amarillo May 4, 2016, no pet.) (mem. op.) (older children expressed desire not to return home); *In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (child "adamant that he d[id] not want to return to live with [parent]"); *Tiller v. Villasenor*, 426 S.W.2d 257, 258 (Tex. App.—Houston [1st Dist.] 1968, no writ) (child's preference may be considered if child is of mature age). During the

48

family's therapy sessions in April and May 2018, K.B. appeared distant, detached, and sad when the family engaged in activities together, and he did not relax until after the therapy sessions concluded.

The other three children expressed "mixed feelings" about returning home. For instance, at times, N.B. wanted to return home, but at other times he did not want to return to mother's home and instead "want[ed] to go to [regular] school full-time and play sports." N.N.I.B. told DFPS caseworker Carlson, at one point, that "she wanted to be adopted by a whole new family," but at another time, she stated that she wanted to return home. *See In re Q.M.*, Nos. 14-17-00018-CV, 14-17-00029-CV, 2017 WL 1957746, at *10 (Tex. App.—Houston [14th Dist.] May 11, 2017, pet. denied) (mem. op.) (although child admitted that "he sometimes f[ound] it difficult to choose between [his] [m]other and his foster mother" holding factor still weighed in favor of finding termination in child's best interest); *In re T.R.C.*, No. 07-15-00389-CV, 2016 WL 1179095, at *5, *7 (Tex. App.—Amarillo Mar. 25, 2016, no pet.) (mem. op.) (holding evidence sufficient to support termination in best interest of child even though child expressed some confusion as to her desires). Mother's therapist, Moore, opined that the children would probably want to return home, but Carlson stated that the children expressed a desire to continue attending regular school, rather than being homeschooled, which would not happen if the children were returned to mother's care.

There is evidence in the record that the children were happy to see mother at their visits with her, they appeared to have a bond with her, and the children, other than K.B., enjoyed spending time with mother during family-therapy sessions. Nevertheless, mother also missed multiple visits with the children, and for approximately two months, she failed to answer the telephone when the children wanted to speak to her. Though mother testified that the children loved her and she wanted them to return to her care and Moore noted that mother missed the children, this is not dispositive of the best-interest analysis. *See In re D.R.L.*, No. 01-15-00733-CV, 2016 WL 672664, at *5 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op.) ("[E]ven where a child is attached to a parent, . . . [her] desire to be returned to the parent [is] not . . . dispositive of the best[-]interest analysis, especially if the parent has engaged in conduct dangerous to the child's well-being." (internal quotations omitted) (second, fourth, and fifth alterations in original)); *see also In re D.S.*, 333 S.W.3d at 384 (best-interest analysis evaluates best interest of children, not parent).

### 2. Current and Future Physical and Emotional Needs and Current and Future Physical and Emotional Danger

*a. Medical Care*

A child's basic needs include routine medical and dental care. *See In re K-A.B.M.*, 551 S.W.3d 275, 288 (Tex. App.—El Paso 2018, no pet.); *In re P.S.*, No. 02-16-00458-CV, 2017 WL 1173845, at *9 (Tex. App.—Fort Worth Mar. 30, 2017,

50

no pet.) (mem. op.). In deciding that termination of parental rights is in the best interest of the children, the trier of fact may consider evidence that a parent neglected to seek appropriate medical treatment for her children. *See In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at \*9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also* TEX. FAM. CODE ANN. § 263.307(b), (12)(A), (F) (considering whether parent demonstrates adequate parenting skills, including providing adequate health and nutritional care and understanding the children's needs, in determining whether parent able to provide child with safe environment). Likewise, the trier of fact may infer from a parent's past inattention to her children's medical needs that such inattention will continue in the future. *See In re L.G.R.*, 498 S.W.3d 195, 205–06 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.R.W.*, 2013 WL 507325, at \*9; *see also In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet denied) (fact finder may infer that past conduct endangering child's well-being may recur in the future if child returned to parent).

Here, when the children entered DFPS's care, they had not been to the dentist or the doctor in approximately five years and did not receive regular checkups, despite the fact that both N.B. and K.B. had "bad" asthma. Further, after N.N.I.B. made her outcry of sexual abuse, although mother cared for the child emotionally after the outcry, mother, by her own admission, focused on consoling father and

51

waited approximately eleven days to seek medical treatment for the child. *See Spurk v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222–24 (Tex. App.—Austin 2013, no pet.) (considering parent's delay in seeking medical treatment in holding evidence sufficient to support finding termination in best interest of child). Moreover, after the staff at Bayshore Medical Center referred N.N.I.B. to another hospital because she could not be appropriately diagnosed and treated at their facility, mother never followed through on the referral. *See In re J.R.W.*, 2013 WL 507325, at *9 (parent's neglect in seeking medical treatment during critical time impacts physical and emotional needs of child).

While the children have been in care of DFPS, they have had medical and dental checkups. And mother's therapist, Moore, who saw the children while they were in DFPS's care, noted that they appeared to be healthy and did not have any injuries. Moore expressed concern that if the children were returned to mother's care, she would never seek medical treatment or care for any of them.

### b. Schooling

When the children entered the care of DFPS, they had not attended regular school in two or three years. In fact, N.B. told DFPS investigator Prejean that he could not "remember the last time [that] he [had gone] to school." *See In re S.P.M.*, No. 07-13-00282-CV, 2014 WL 241796, at *7–8 (Tex. App.—Amarillo Jan. 21, 2014, no pet.) (mem. op.) (considering "parents' poor performance in the past

regarding school attendance" in holding sufficient evidence to support best-interest finding); *In re H.L.B.*, No. 01-12-01082-CV, 2013 WL 3866651, at *7 (Tex. App.—Houston [1st Dist.] July 23, 2013, no pet.) (mem. op.) (in regard to current and future danger to children, noting mother caused children to miss school). Mother reported to DFPS that she had been homeschooling the children,[13] but she was unable to produce any school books or school-related materials showing that she was actually providing adequate homeschooling for the children. Mother also did not have a designated area in her home where homeschooling took place, and the children did not have a schedule for their homeschooling. Further, mother was not abiding by "certain rules for homeschooling in Texas," and father conceded that he and mother had not "been approved by the State of Texas to homeschool" the children. *See T.W. v. Tex. Dep't of Family & Protective Servs.*, No. 03-18-00347-CV, 2018 WL 4100799, at *2, *6–7 (Tex. App.—Austin Aug. 29, 2018, no pet.) (mem. op.) (although parent withdrew child from school so that she could be homeschooled, parent never provided information about such homeschooling); *In re A.O.M.*, No.

---

[13]    Although not applicable to the instant case, the Texas Legislature has amended Texas Family Code section 161.001 to prohibit a court from terminating parental rights based solely on evidence that a parent has homeschooled her children. *See* TEX. FAM. CODE ANN. § 161.001(c)(1); *In re G.R.B.*, No. 04-18-00271-CV, --- S.W.3d ---, 2018 WL 4903059, at *2 (Tex. App.—San Antonio Oct. 10, 2018, pet. denied) (Texas Family Code section 161.001(c) is not applicable to suits filed before September 1, 2017). In any event, these circumstances are also not present in the instant case.

14-15-01012-CV, 2016 WL 1660630, at *3, *6 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, pet. denied) (mem. op.) (although parent was purportedly homeschooling children, he could not provide any lesson plans or curriculum and children initially performed poorly and "struggled to catch up to grade level" after they entered DFPS's care).

When the children entered DFPS's care, they were "behind" in school, found it to be challenging, and were not used to its structure. *See In re M.F.*, No. 01-17-00835-CV, 2018 WL 1630180, at *8 (Tex. App.—Houston [1st Dist.] Apr. 5, 2018, pet. denied) (mem. op.) (although mother testified that she had homeschooled child, child was academically behind her peers when she entered DFPS's care); *In re A.O.M.*, 2016 WL 1660630, at *3–4, *6. At the time of trial, however, the children, who had been attending regular school while in DFPS's care, were doing well in their schooling. *See In re B.M.C.*, No. 01-16-00300-CV, 2016 WL 5787286, at *7 (Tex. App.—Houston [1st Dist.] Oct. 4, 2016, pet. denied) (mem. op.) (considering that children attended school while in DFPS's care); *In re A.G.*, No. 05-15-01298-CV, 2016 WL 3225894, at *7 (Tex. App.—Dallas June 10, 2016, pet. denied) (mem. op.) (noting DFPS, while children in its care, ensured that they attended school).

According to mother's therapist, Moore, the children were "gain[ing] a lot from being in school," and DFPS caseworker Carlson concluded that the children

54

deserved to be in regular school so that their educational needs could be fully met. The children also expressed a desire to continue attending regular school. Moore was concerned that if the children were returned to mother's care, she would start homeschooling them again despite the fact that mother could not provide schooling "beyond [that] . . . of [an] 8th grade education." *See In re S.Y.*, 435 S.W.3d 923, 930 (Tex. App.—Dallas 2014, no pet.) (noting plan of parent, with limited education, to homeschool child constituted poor judgment and unreasonable decision-making); *In re K.A.*, No. 10-12-00253-CV, 2012 WL 5697080, at *7 (Tex. App.—Waco Nov. 15, 2012, no pet.) (mem. op.) (holding evidence sufficient to support best-interest finding where parent planned to resume homeschooling child upon return although child was behind in school when he entered DFPS's care). When asked whether mother understood that the children needed to be in school every day, Moore responded that she was "not sure," and Moore concluded that the children should not be returned to mother's care unless she was required to send them to regular school.

### c. *Safe and Stable Home*

The children's need for a safe and stable home is the paramount consideration in assessing the best interest of the children. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th

55

Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment). Here, there is no evidence in the record that mother is able to provide the children with a safe and stable home. *See In re P.S.*, 2017 WL 1173845, at *9 (children's basic needs include shelter and safe and stable home environment); *see also Adams*, 236 S.W.3d at 280 (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest).

At the time the children were removed from mother's care, mother's home was unsanitary, contained "a horrible odor" and mice, and did not have running water or air conditioning. *See In re A.R.R.*, 2018 WL 3233334, at *5 (unclean home that lacked running water jeopardized children's physical and emotional well-being); *In re A.L.*, 545 S.W.3d at 148 (home's unsanitary and unsafe conditions, including clutter, relevant in determining emotional and physical needs of child and emotional and physical danger to child). The children could use the toilet in the home, but could not flush it, and there was a bucket of dirty water on the floor that "the family used to wipe themselves off." *See In re A.K.*, Nos. 07-17-00353-CV,

07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.) (toilet in parent's home "did not work" and child had to go to neighbor's home in order to bathe). When the weather was hot outside, the inside of the home was hot, and during the wintertime, the home was freezing cold. Mother's therapist, Moore, expressed concern that mother's home did not have heat, and she believed that the children should not be allowed to be in the home when it was that cold. *See In re A.R.R.*, 2018 WL 3233334, at *5–6 (parent unable to provide safe and stable home environment where home lacked electricity and water during winter months).

Also, there were wooden boards in the interior of the home that held up the ceilings and visible holes inside the home. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(D) (considering whether parent demonstrates adequate parenting skills, including providing "a safe physical home environment"); *In re A.A.M.*, No. 04-17-00709-CV, 2018 WL 1610930, at *3 (Tex. App.—San Antonio Apr. 4, 2018, no pet.) (mem. op.) (home with "torn-up walls with holes in them" not safe for child); *Wilson v. State*, 116 S.W.3d 923, 925, 929–30 (Tex. App.—Dallas 2003, no pet.) (evidence that parent allowed child to stay in home that was "falling apart" supported best-interest finding). The photographs taken of mother's home in May 2017 show a cluttered living room, containing a couch and a large bucket of water, and a bedroom, containing only a sub-floor, a small bed, trash, and other items. Mother

57

admitted to DFPS investigator Prejean that the children did not need to be living in such conditions, and she stated that the family was "about to lose their home."

Photographs taken of mother's home in July 2017, shortly after the children were removed from mother's care, show a kitchen in disrepair, containing trash and broken cabinetry; a cluttered bedroom with only a sub-floor; a dining area in disrepair, containing clutter and trash and only a sub-floor; a shower with dirt or other dark-substance at the bottom; a cluttered living room with a wooden board appearing to hold up the ceiling; multiple other bedrooms full of clutter to the point that they were impassible; a cluttered bathroom with a plastic bag presumably over a window and containing only a sub-floor; and a dilapidated exterior, with numerous items, including a washing machine, that appear to have been discarded in the yard. Carlson explained, when viewing these photographs at trial, that mother's kitchen was in a poor condition and there was a big hole in the wall of N.N.I.B.'s bedroom; a cluttered and unsafe "bedroom/hallway" for one of the children; another cluttered bedroom containing unsafe objects for the children; a bathroom without actual "flooring" and a "toilet [that was] not locked down to the ground"; and a wooden board in the living room that appeared to be holding up part of the ceiling. Similar wooden boards were also found in another bedroom inside the home and on the home's front porch.

Further, when Carlson visited mother's home eight months later in February 2018, she saw that a "wood[en] [board] was still holding up the [home's] ceiling in the living room" and there were multiple holes in one of the bedrooms, though father had patched one hole in another bedroom. In the end, Carlson, like Moore, believed that the home's conditions were unsafe. Notably, mother and father prevented Carlson, during her February visit, from seeing the home's two bathrooms and their bedroom. *See In re J.S.G.*, No. 14-08-00754-CV, 2009 WL 1311986, at *9 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) (considering parent's refusal to allow DFPS caseworker to visit home in determining best interest of children); *In re A.B.*, 269 S.W.3d 120, 129–30 (Tex. App.—El Paso 2008, no pet.) (parent refused to allow DFPS caseworker to have access to her home). However, the bedrooms that Carlson did observe were not set up for children and were cluttered to the point that they were unsafe. Although the home had electricity, Carlson could not determine whether it had running water or functional bathrooms. Photographs taken of mother's home in February 2018 show the exterior of the home and a dilapidated hallway inside the home that appears impassible due to clutter.

Carlson attempted to visit mother's home again in April 2018, but the first time that she went to the home, mother would not allow her to come inside because she was "a stranger or rapist or predator." When Carlson returned to the home the following day with Moore, mother and father allowed her to come inside, but they

59

only let her into the living room, which Moore described as fine, nice, clean, and "picked up." *See In re J.S.G.*, 2009 WL 1311986, at *9; *In re A.B.*, 269 S.W.3d at 129–30. Carlson noted that the home's front porch, at the time, was unsafe because the ceiling of the porch was falling down and there were three wooden boards holding it up. Photographs taken of mother's home in April 2018 show the exterior of the home to be in disrepair; a hole in the front door of the home and holes in the ceiling/roof over the front porch; wooden boards holding up the ceiling/roof above the front porch, which was visibly falling down; termite damage; and rotting wood on the exterior of the home.

Because Carlson was prohibited from entering mother's home after April 2018, she made several subsequent "drive-by" visits to the home to view its exterior, and during those visits, she observed caution tape placed around the front porch area, wooden boards holding up the porch in multiple areas, and a hole in the home's front door. According to Carlson, an individual standing on the front porch of mother's home could see into the attic as well as into the interior of the home through the hole in the front door. Carlson opined that pests, such as bats, mice, rats, and insects, could enter the home through the hole.

Carlson explained that the condition of mother's home was important because the children needed to be physically safe in their home, and Carlson expressed concern about the damage to both the interior and exterior of mother's home. More

specifically, Carlson explained that the home was unsafe because pests were able to enter the home through its holes, the home appeared to be collapsing in multiple rooms, there were "limited necessities" within the home, and it was not set up for the children to be returned. Moreover, mother's home was involved in litigation, and the home was not in the name of either mother or father.

Moore believed that the children should not be allowed to return to mother's home unless it was safe and the home had electricity and running water. And Carlson explained that the children deserved a safe and stable home, and termination of mother's parental rights was in the best interest of the children, in part, because mother had failed to show improvement in the condition of her home.

Although mother argues that her home does not pose a danger to the children now or in the future because they had never been physically injured in her home, the children are not required to have sustained injury for termination of mother's parental rights to be in their best interest. *See In re D.W.*, 445 S.W.3d 913, 932–33 (Tex. App.—Dallas 2014, pet. denied) (although children suffered no physical injuries when parent left them alone, sufficient evidence supported best-interest finding); *In re M.L.H.-M.*, No. 12-13-00316-CV, 2014 WL 357048, at *5 (Tex. App.—Tyler Jan. 31, 2014, no pet.) (mem. op.) (evidence sufficient to support finding termination of parental rights even where child did not sustain serious

injuries while in parent's care); *see also Boyd*, 727 S.W.2d at 533 (children endangered even when they do not suffer actual injury).

In addition to the poor physical condition of mother's home, the children, while living in mother's home, smelled and wore dirty clothes or clothing with holes. *See In re A.T.*, 406 S.W.3d at 371–72 (poor hygiene may constitute condition that endangers child's physical and emotion well-being); *In re Z.G.*, No. 11-11-00078-CV, 2012 WL 745090, at *4 (Tex. App. Mar. 8, 2012, no pet.) (mem. op.) (parent unable to provide safe environment for children where children's hygiene was poor); *In re C.M.W.*, 2003 WL 579794, at *5 (children's basic needs include cleanliness and clothing); *see also In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (fact finder may infer from parent's past inability to meet child's physical and emotional needs inability or unwillingness to meet child's needs in future). And the children disclosed that there were times, when they lived with mother, that they were hungry and would go "a couple [of] days" without eating. When DFPS investigator Prejean visited the home in May 2017, the only food in the home was a single bag of ramen noodles. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(A) (considering whether parent demonstrates adequate parenting skills, including providing adequate health and nutritional care, in determining whether parent able to provide child with safe environment); *In re P.S.*, 2017 WL 1173845, at *9 (children's basic needs include food); *In re Z.G.*, 2012 WL 745090,

at *4 (parent unable to provide safe environment for children where home contained no edible food). Mother agreed that there was very little food in the home when Prejean came to visit, including no food in the refrigerator or the pantry, and she noted that there were times when the family had little to no groceries. In fact, when asked at trial if she would be "surprise[d] . . . if [the] children [had] said that there were some days that they went without eating," mother responded that "it wouldn't surprise [her] at all." Even after the children were removed from her care, mother reported during her individual-therapy sessions that she and father had still not been eating very much. But, mother stated that the family would not accept governmental assistance, such as "food stamps," because she did not "believe in it." *See In re T.R.*, 491 S.W.3d 847, 856 (Tex. App.—San Antonio 2016, no pet.) (noting parent's failure to accept assistance in holding termination in best interest of child); *In re C.A.G.*, 2012 WL 2922544, at *7 (considering parent's failure to obtain "food stamps to help feed her children" when addressing parent's inability to provide stable home).

Although mother did testify at trial that "there w[ere] times where [the family] . . . ha[d] [a] substantial amount of groceries" and the children, while in her care, had food and were not malnourished, we note that to the extent that there are discrepancies in the record, the trial court, as the fact finder, is "the sole judge of the credibility of the witnesses and the weight to give their testimony." *See Jordan*, 325

63

S.W.3d at 713; *see also In re J.P.B.*, 180 S.W.3d at 573 (appellate court may not weigh witness's credibility because it depends on appearance and demeanor which are within domain of trier of fact). And the trial court may choose to believe one witness and disbelieve another. *City of Keller*, 168 S.W.3d at 819. It is also free to believe or disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony. *In re C.E.S.*, 400 S.W.3d at 195.

Ultimately, Moore opined that the children needed permanency and returning the children to mother's care would be detrimental to their emotional well-being and not in their best interest. And Carlson opined that it would be in the best interest of the children to have a safe and stable home where they were cared for, all their needs were provided for, and they were loved. Mother concedes in her briefing that the evidence concerning the suitability of her home may weigh against returning the children to her care.

### d. Domestic Violence

The children's exposure to domestic violence in the home undermines the safety of the home environment and is relevant in determining the best interest of the children. *See In re A.K.*, 2018 WL 912703, at *5; *In re A.M.Y.*, No. 04-15-00352-CV, 2015 WL 6163212, at *4 (Tex. App.—San Antonio Oct. 21, 2015, no pet.) (mem. op.); *see also In re O.N.H.*, 401 S.W.3d 681, 685 (Tex. App.—San Antonio 2013, no pet.) ("[I]t was a form of abuse for the children to be exposed to

64

an environment where physical abuse occurred even if it was not directed toward them."); *In re J.I.T.P.*, 99 S.W.3d at 846, 848 (exposure to violence, even when child not intended victim, supports finding termination in child's best interest).

Here, mother and father admitted that they had engaged in domestic violence in the home and prior to the children's removal, and N.B. disclosed that he had seen father push mother. According to father, he and mother "argue[d] a lot," and during one incident, he hit mother in the side, but he "did not break her ribs." *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (considering history of abusive and assaultive conduct by child's family in determining whether parent able to provide child with safe environment); *In re J.S.-A*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.) (evidence of violence in home supports finding placement of children with parent likely to subject them to emotional and physical danger now and in future); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

Although Moore opined that through therapy mother and father had begun to communicate better, resolve conflicts better, discuss the triggers that had led to their disagreements, and "come up with some different strategies when they are feeling upset with each other," mother also reported that she and father, at times, did

not get along. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (recognizing trial court may measure parent's future conduct by past conduct). And mother failed to complete her required domestic-violence classes or achieve her individual-therapy goal of "discuss[ing] how domestic violence affect[ed] [the] children." *See* TEX. FAM. CODE ANN. § 263.307(b)(11) (considering parent's willingness and ability to effect positive environmental and personal changes in determining whether parent able to provide child with safe environment); *In re A.J.W.*, No. 04-17-00682-CV, 2018 WL 1733172, at *4 (Tex. App.—San Antonio Apr. 11, 2018, no pet.) (mem. op.) (in regard to emotional and physical danger to child, noting domestic violence in home and parent's failure to complete services offered with regard to that issue).

Further, during the pendency of the instant case, mother has been angry, hostile, argumentative, aggressive, and combative toward her therapist, Moore, and DFPS caseworkers. And at times, she behaved that way in front of the children. Mother also, during family-therapy sessions and her visits with the children, would become "upset with the children or upset with something that was going on" and that caused angst and tension. Moore, in her March 2018 Progress Report, noted that mother had "regressed in terms of her ability to monitor and manage her emotions and behaviors," and Moore expressed concern that mother had exhibited her angry and aggressive behaviors in front of the children. *See In re P.M.B.*, No.

66

01-17-00621-CV, 2017 WL 6459554, at \*10, \*12–13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (parent's hostile and aggressive behavior during case supported best-interest finding); *In re E.W.*, No. 14-14-00751-CV, 2015 WL 556399, at \*6, \*10 (Tex. App.—Houston [14th Dist.] Feb. 10, 2015, no pet.) (mem. op.) (considering evidence of parent's angry behavior with DFPS caseworkers).

### e. Untreated Mental-Health Issues

A trial court may consider a parent's mental state as endangering to her children's well-being, and a parent's lack of progress in managing her mental-health conditions is relevant to the best-interest determination. *See In re R.M.*, No. 02-18-00077-CV, 2018 WL 3468464, at \*8–9 (Tex. App.—Fort Worth July 19, 2018, no pet.) (mem. op.); *In re J.I.T.P.*, 99 S.W.3d at 845–48; *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) ("While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows h[er] to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights.").

Mother testified that she had been diagnosed with depression, anxiety, and PTSD, but she did not seek any treatment for her mental-health issues. Mother had also been diagnosed with post-partum depression, but she did not take any

medication for that condition. Mother told her therapist, Moore, that she would not take medication for mental-health issues and she would not see a psychiatrist.

DFPS investigator Prejean testified that mother believed that her family members were "fram[ing]" her, they were trying to destroy her family, and "they probably ha[d] cameras in her television." Mother declared that her family members were powerful, were "out to get her," were "controlling everything," and had been "cursing her with the [B]ible." Mother yelled at K.B. because she believed that he was "communicating" with her family members. According to Moore, mother also believed that DFPS was involved in "a conspiracy against her."

Although mother did participate in individual therapy during the pendency of the instant case, she stopped attending those sessions prior to trial, did not successfully complete her individual-therapy requirement, and did not achieve any of her individual-therapy goals. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11) (considering parent's willingness and ability to effect positive environmental and personal changes and willingness and ability to seek out, accept, and complete counseling services in determining whether parent able to provide child with safe environment). In her most recent Progress Report, Moore stated that mother was combative, verbally aggressive, hostile, argumentative, and defensive, and her mood appeared to be anxious, suspicious, and irritable. Mother repeatedly stated that she did not trust DFPS caseworker Carlson or Moore, and Moore noted that her thought

68

processes were paranoid. Previously, mother had reported to Moore that she was paranoid, easily angered and agitated, and did not "work with the public well." Moore expressed concern it was "difficult to reason with" mother, and Moore noted that mother was unable to "see things from any other perspective" and "misperceive[d] the intentions of others."

### 3. Parental Abilities

#### a. Supervision of Children and Medical Care

The record reveals on at least two occasions mother left the family. Most significantly, in September 2016, mother left father and the children for three or four months because she needed "to breathe" and "[t]o vent" after an argument with father. During those months, mother did not speak to father or to the children. While mother, who had been solely responsible for caring for the children while father worked, was away, father could not afford to pay for child care, and he left the children with their maternal grandmother. According to mother, she knew that father would not have child care for the children when she left the family. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(C) (considering whether parent demonstrates adequate parenting skills, including providing "supervision consistent with the child's safety," in determining whether parent able to provide child with safe environment); *In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the

69

custody of a parent who is unable or unwilling to protect them or attend to their needs because they have no ability to protect themselves."); *In re C.M.W.*, 2003 WL 579794, at *5 (children's basic needs include appropriate supervision).

Notably, while the children were in the care of their maternal grandmother, N.N.I.B. was sexually abused by mother's cousin, mother's eldest daughter, and another woman. Mother testified that she did not protect N.N.I.B. from being sexually abused because she "w[as] not around." Further, as previously noted, when N.N.I.B. made her outcry of sexual abuse to mother and father, mother delayed in seeking medical treatment for the child, failed to follow through and take N.N.I.B. to the hospital to which she was referred, and focused on "consol[ing] [father] because [he] was very angry." *See K.N.M. v. Tex. Dep't of Family & Protective Servs.*, No. 03-18-00284-CV, 2018 WL 4087730, at *8 (Tex. App.—Austin Aug. 28, 2018, pet. denied) (mem. op.) (in addressing parental abilities considering parent's failure to take child to medical appointments); *In re J.H.*, No. 07-17-00307-CV, 2017 WL 6459537, at *5 (Tex. App.—Amarillo Dec. 11, 2017, pet. denied) (mem. op.) (in regard to parental abilities considering parents' failure to seek prompt medical attention for children when needed).

Because DFPS became involved with the family after mother failed to take N.N.I.B. to the referred-to hospital, mother's therapist, Moore, stated that mother believed that if she had never taken N.N.I.B. for medical treatment after the child's

outcry of sexual abuse then she would still have custody of the children. And Moore expressed concern that if the children were returned to mother's care, she would "never take any of them for medical treatment or care again [because] she perceive[d] that [to be] the impetus that caused [DFPS's] involvement" in this case.

### b. Visits with Children/Family Therapy

While the children were in the care of DFPS, mother had visits with them and participated in family-therapy sessions. According to mother, these visits with the children were appropriate. And DFPS caseworker Carlson testified that when mother actually attended visits with the children, she brought them food, asked them about the activities they were participating in, and "how their lives [were] going." The children were happy to see mother at visits.

However, Carlson also testified that during the pendency of the instant case, mother missed multiple visits with the children, including one visit in January 2018, one visit before January 2018, most of her visits in May 2018, all of her visits in June 2018, and her visits in the beginning of July 2018. At the last visit that mother had with the children, she arrived forty-five minutes late. When mother was not able to attend a visit with the children, she often failed to notify DFPS, and the children were disappointed when mother failed to show up. *See K.J. v. Tex. Dep't of Family & Protective Servs.*, No. 03-18-00556-CV, 2018 WL 6816795, at *3 (Tex. App.—Austin Dec. 28, 2018, pet. denied) (mem. op.) ("Missing visits can be conduct that

71

subjects the children to instability and uncertainty and therefore endangers them . . . .”).  And mother's failure to answer her telephone for approximately two months when the children wanted to speak to her caused the children to become upset.  *See In re R.M.P.*, No. 04-17-00666-CV, 2018 WL 2976451, at *3 n.4 (Tex. App.—San Antonio June 3, 2018, pet. denied) (mem. op.) (noting, in regard to parental abilities, parent's failure to answer telephone calls from child).

In regard to family-therapy sessions, mother's therapist, Moore, testified that the children's behavior during their family-therapy sessions with mother was anxious, depressed, and frustrated.  At times, during the family-therapy sessions and mother's visits with the children, mother would become "upset with the children or upset with something that was going on" and that caused angst or tension.  In a Progress Report from one of Moore's individual-therapy sessions with father, Moore, who observed a visit between mother, father, and the children, noted that mother appeared "upset and agitated" at the visit, while father remained calm.  And Moore testified that during at least one visit with the children, she had to remove mother from the visit, talk to her, and redirect her.

Moreover, Moore, in her December 2017 Progress Report, stated that during a visit with the children, mother criticized one of the children because he was wearing pajamas.  And when the DFPS caseworker tried to redirect mother, mother became agitated, argumentative, and "stormed out of the visitation room."  After

72

Moore encouraged mother to return to the visit, mother spent time talking to each child and "grooming" them. But, Moore expressed concern that mother had become angry, agitated, and argumentative with the DFPS caseworker in front of the children. *See In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *10 (Tex.. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (considering evidence that parent, during supervised visits with children, screamed and cursed at DFPS supervisor).

While mother did have some positive interactions with the children during family-therapy sessions, mother did not achieve the goals Moore set for family therapy, which included being able to respond to the emotional needs of the children appropriately, displaying open communication, and expressing feelings appropriately. *See T.V.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-13-00806-CV, 2014 WL 1285772, at *4–5 (Tex. App.—Austin Mar. 27, 2014, no pet.) (mem. op.) (evidence sufficient to support best-interest finding where parent lacked ability to appropriately respond to child's emotional needs).

In regard to mother's ability to parent, Moore testified that she did not believe that mother could parent the children independently. And although mother appeared to love the children and missed them, mother needed "a lot of help to overcome a lot of obstacles." Moreover, although mother might have good intentions related to the children, her thinking was rigid and difficult to overcome.

73

### 4. Plans for Children and Stability of Proposed Placement

DFPS caseworker Carlson testified that DFPS sought to have the children adopted into a loving and safe home. And Carlson opined that it would be in the best interest of the children to have a safe and stable home where they were cared for, all their needs were provided for, and they were loved. According to Carlson, it was very likely that the children would be adopted because certain relatives and certain foster families had expressed interest in adopting them. In fact, at the time of trial, DFPS was completing home studies with certain relatives. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest); *In re J.D.*, 436 S.W.3d at 118 ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest.").

Although mother asserts on appeal that it is speculative as to whether the children will be placed with their relatives and that there is no evidence of the parental abilities and stability of anyone with whom the children might be placed, a "lack of evidence about [specific] definitive plans for [the] permanent placement and adoption" of the children is not dispositive to the best-interest analysis. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013) (internal quotations omitted); *see also In re C.H.*, 89 S.W.3d at 28. Instead, we examine the entire record to determine best interest,

74

even where DFPS is "unable to identify with precision the child[ren]'s future home environment." *In re E.C.R.*, 402 S.W.3d at 250 (internal quotations omitted); *see also In re C.H.*, 89 S.W.3d at 28.

While in DFPS's care, the children had been attending regular school and doing very well. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (noting stability and permanence important to upbringing of child and affirming termination in best interest when child thriving in foster care); *In re T.A.S.*, No. 05-15-01101-CV, 2016 WL 279385, at *6 (Tex. App.—Dallas Jan. 22, 2016, no pet.) (mem. op.) (considering children's improvement in foster care). The children also had medical and dental checkups and appear to be healthy. At the time of trial, K.B. lived in an emergency shelter, where he had chosen to be, and N.B., M.B., and N.N.I.B. lived in a foster home. DFPS had a foster family that was immediately available to take all of the children. Father concluded that it would be in the children's best interest for them to have a safe home, education, medical attention, and "food every day."

In regard to the stability of the children's proposed placement, we have already discussed in extensive detail mother's lack of a safe and stable home for the children, the likelihood that she will once again remove the children from regular schooling if they are returned to her care, and the concern that mother will not seek medical treatment or care for the children if they are returned. *See* TEX. FAM. CODE

75

ANN. § 263.307(a), (b)(11), (12)(A), (D), (F). On appeal, however, mother asserts that she "had made changes and repairs to [her] home" and she notes that her therapist, Moore, testified that the living room of mother's home—the only portion of the home that Moore had ever entered—was fine, nice, clean, and "picked up."

When mother was asked at trial to describe the changes that she had made to her home so that the children could be returned, mother stated that she and father "did the inside of the house to the best of [their] ability," including the bathrooms and "the rooms." Mother noted, however, that there were still wooden boards inside the home that were "propping the roof up." *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (concluding short duration improvements do not necessarily negate long history of irresponsible choices); *In re A.L.*, 545 S.W.3d at 148 (holding evidence sufficient to support best-interest finding although parent made some improvements to home and addressed some issues that caused child to be removed); *see also In re S.P.M.*, 2014 WL 241796, at *8 (given parents' past performance, fact finder free to reject their assertions of future stability and having learned from their mistakes). While some of the photographs of mother's home, purportedly depicting it "at th[e] present time," show what appear to be patches to a wall, they also show a ceiling in disrepair.

So despite mother's assertion that she had made improvements to her home, we note that mother also prevented anyone involved in the instant case, including

76

her therapist, Moore, DFPS caseworker, Carlson, or the children's attorney ad litem, from seeing any of the purported changes to her home. For instance, in February 2018, mother prevented Carlson from seeing the home's two bathrooms and her and father's bedroom, and Carlson could not determine if the home had running water or functional bathrooms. In April 2018, a month before trial, mother refused to allow Carlson or Moore to see any room of the house other than the living room. And while Carlson and Moore were inside mother's home, mother was combative, verbally aggressive, hostile, argumentative, and defensive. Mother testified that she did not want to let Carlson or the children's attorney ad litem into her home because they would "see[] something" and that would prolong her reunification with the children.

Carlson testified that the condition of mother's home was important because the children needed to be physically safe in their home, and she was concerned with the damage to both the interior and exterior of mother's home. Specifically, Carlson explained that the home was unsafe because pests were able to enter the home through its holes, the home appeared at risk of collapsing in multiple rooms, there were "limited necessities" within the home, and it was not set up for the children to be returned. Additionally, mother's home was involved in litigation, and the home was not in the name of either mother or father.

What is more, mother concedes in her briefing that "[t]here is ample evidence that [her] home was a less than ideal living environment for the children" and the evidence may weigh against placing the children back in her home immediately.

### 5. Availability of Assistance and Acts and Omissions Indicating Existing Parent-Child Relationship Not Proper

A parent's inability to provide a stable home supports a finding that termination of parental rights is in the best interest of a child. *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.). There is ample evidence that mother cannot provide the children with a safe and stable home. *See, e.g.*, *In re G.M.G-U.*, No. 06-16-00075-CV, 2017 WL 1018607, at *12 (Tex. App.—Texarkana Mar. 16, 2017, pet. denied) (mem. op.) (noting prior to children's removal, parent placed children, and allowed them to remain, in an unsanitary home).

Further, a parent's failure to comply with her FSP supports a finding that termination is in the best interest of the children. *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.B.*, 207 S.W.3d at 887–88; *see also* TEX. FAM. CODE ANN. § 263.307(b)(11) (considering parent's willingness and ability to effect positive environmental and personal changes in determining whether parent able to provide child with safe environment). Here, mother's FSP required her to complete a psychosocial evaluation, parenting classes, domestic-violence classes, individual therapy, family therapy, and the Getting

Started Program. Mother was also required to submit to random narcotics testing, maintain stable housing, acquire and maintain a working telephone, and attend visits with the children or contact DFPS if she was unable to attend a visit. Mother completed her psychosocial evaluation and submitted to random narcotics testing in January and April 2018; however, she did not submit to her required narcotics testing on October 6, 2017 or on January 19, 2018. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (trier of fact could reasonably infer that parent's failure to submit to required narcotics testing indicated that she was avoiding testing because she was using narcotics).

Mother also continued to live in the same home that the children had lived in prior to their removal by DFPS. And although DFPS had offered "government[al] assistance for housing," mother had refused. Moreover, mother failed to complete the Getting Started Program, her parenting classes, her domestic-violence classes, and her individual therapy. In regard to her individual-therapy requirement, specifically, mother's therapist, Moore, testified that mother did not make progress during individual therapy and she stopped attending therapy prior to trial. Moore felt that mother should continue participating in individual therapy for another year because she had not met any of her treatment goals; however, when asked whether she believed that mother would actually continue participating in individual therapy, Moore could not say. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (considering

79

parent's willingness and ability to seek out, accept, and complete counseling services in determining whether parent able to provide child with safe environment).

Carlson expressed concern regarding mother's inability to complete her FSP because the purpose of mother participating in the required services or classes was for her to "learn [that] certain . . . behaviors [were] not appropriate." In Carlson's opinion mother, by not completing her FSP, had not demonstrated an ability to appropriately parent the children or an understanding of the issues that had caused the children to enter DFPS's care in the first place.

Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights is in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). And we conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights is in the children's best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of the children.

Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding that termination of mother's parental rights is in the best interest of the children. *Id.*

We overrule mother's fifth issue.

## Conclusion

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.